Denio, J.
This case has been argued upon the assumption that the funded debt of the United States in the form of stock, is, by the Constitution, absolutely exempt from taxation by the state governments. Hence, the position mainly argued by the counsel for the city of Hew York, was that the existing law for the assessment and taxation of corporations, of the class to which the appellant belongs, looks to the capital stock of the corporations paid in, or secured to be paid in, as the subject of taxation, irrespective of the manner in which it has been, in vested. Consistently with this position it is argued that it is not a circumstance of any importance, that a portion of the moneys contributed by the subscribers has been invested in property not in itself subject to taxation; that it is the same thing in effect as though so much money had been lost; and if such had been the case, it is further insisted that the corporation would, notwithstanding, be liable to taxation in the whole amount of capital originally paid in, or secured to be paid in, except such portion thereof as had been paid out for the purchase of real estate. If the provisions of the Bevised Statutes respecting the taxation of moneyed corporations had remained unchanged, the argument would have had much weight; for the principle of taxation which these enactments established, was that the amount of the capital, with the exception before mentioned, was to be taken as the amount of the personal estate of the corporation for which it was to be taxed, whether it had been impaired by losses or increased by accumulated profits. (1 R. S., 414, §§ 1 to 6; Bank of Utica v. City of Utica, *194 4 Paige, 399; The People v. Board of Supervisors of the county of Niagara, 4 Hill, 20.) In substance, it was the institutions which were taxed under these provisions, and not the property possessed by them at the time the assessment was made. The measure of assessment was the nominal capital originally-contributed, which was compared, in distributing the public burdens, with so much property actually possessed by natural persons who were taxpayers. Under such a system it might be fairly argued that.it was unimportant in what manner the moneys had been invested, for the existing property was not an element which entered into the valuation; but it was the sum which the corporation • had, when all the subscriptions had been paid in and before any investment had been made. The character of the investments would be immaterial. But this rule had been changed before the assessment under consideration was made. .In the year 1853, the amount of surplus profits, or reserved funds, was directed to be added .to the amount of the capital, and there was a provision for exemption in the case of corporations which had hot been in the receipt of net income (ch. 654). It is not material to determine whether these provisions would have affected the question; for in 1857 an act was passed, which completely changed the system of assessment of these corporations. The material provision was as follows: “ The capital stock of every company liable to taxation, except such part of it as shall have been excepted in the assessment roll, or shall have been exempted by law, together with its surplus profits, or reserved funds, exceeding ten per cent of its capital, after' deducting the assessed value of its real estate, and all shares of stock in other corporations actually owned by such company which are taxable upon their capital stock under the laws of this State, shall be assessed at its actual value, and taxed in the same manner as the other personal and real estate of the-county ” (ch. 456, § 3). It -is manifest - that under this provision, the assessors could not any longer take the nominal capital as, under all circumstances, the amount of the assessment. If it were alleged that this did not represent its actual value, it would be their *195 duty to look at its market price, and, if necessary, to ascertain the character and worth of the securities in which its funds had been invested. It would be equally their duty to inquire whether any of this property, into which the capital had been converted, was exempted by law from taxation. Prima facie it may be that the nominal amount of the capital would be considered its actual value; but where it should be shown that it had met with losses, or that its investments had otherwise depreciated, other means would have to be resorted to in order to ascertain the actual value of the assets in which its capital consisted. The market price of its shares would ordinarily furnish a practical test; but either the assessor or the taxpayer would have a right to examine and have an estimate made of the value of the securities. (The Oswego Starch Factory v. Dolloway, 21 N. Y., 449.) The reference to exempt property in the section of the statute which I have transcribed, is in pari materia with the 4th section of the title of the Revised Statutes relating to property liable to taxation. That section declares that all property exempted from taxation by che Constitution of this State, or under the Constitution of the United States, shall not be liable to be assessed or taxed under these provisions. (1 R. S., 388.) It follows, therefore, from the very language of the statutes, that if the Bank of the Commonwealth has invested a part of its capital paid in, in a stock which is exempt from taxation under the Constitution of the United States, such portion is to be excepted from, the assessment. The position of a bank in this respect is precisely the same as that of an individual taxpayer. It is, as a general rule, assessed and taxed for all its property of every kind; but there is an exception as to such part of it as the. Constitution and laws of the Union and of the State have, upon special reasons of policy, declared shall be exempted. Whether such exempt property is found in the hands of an individual, or in the possession of a corporation taxed upon the actual value of its capital, the rule is the same: the exempt property is to be deducted from the aggregate valuation, and the tax is to be imposed upon the residue.
*196 The question then arises, whether the public debt of the United States is exempt by the Federal Constitution from taxa-. tion under the general laws for the assessment and collection of taxes which are in force in this State. • It is essential in the outset, to have a clear perception of the principles’ upon which taxes are imposed under our State laws. We do not select particular subjects of taxation and, upon motives of policy, burden these with the public contributions or a disproportionate part of them in exoneration of the other property of the citizen. The rule, on the contrary, is to tax every person for all the property he possesses. This doctrine is announced at the commencement of the chapter of the Revised Statutes, respecting taxation: “ All lands and all personal estate within this. State, whether owned by individuals or by corporations, shall be liable to taxation, subject to the exemptions hereinafter specified.” (1 R. S., 387.) The exceptions are inconsiderable, and only tend to prove the universality of the principle. And there is no artificial rule of valuation, by means of which a discrimination can be made, in favor of or against any particular species of property. The real estate is to be assessed at its full and true value, and that at which the assessors would appraise it in payment of a just debt due from-a solvent debtor; and the personal estate is to be set down at its full and true value,, over and above the amount of debts due from the person assessed. (Laws of 1851, ch. 176, § 8.) If, therefore, the stock in question is assessable at all, it is to be included in the mass of the taxpayer’s property, and is to be set down at what it is really worth, in the same manner as every other item of his taxable property. It is not taxable by name; and there is no discrimination in favor of -or against it, but the bond or script which furnishes the evidence of the title is regarded like any other security for money.
Having premised thus much, the question recurs whether i there is anything in the Constitution of the United States, which, by a fair interpretation, forbids the States under their tax laws from including in the aggregate valuation of the taxpayer’s property, in respect to which he is to be taxed, *197 money which he has lent to the Federal Grovernment, for which he holds its evidence of indebtedness. It is the constitution alone which is to be looked to, for congress has never passed any statute on the subject. That body has from time to time authorized the executive department to borrow money, to fix the rate of interest to be paid, and to pledge the public credit for its payment; but it has not undertake^, to restrain or limit the taxing powers of the State governments, in respect to the money lent or the script or securities to be issued upon such loans. It has said nothing on that subject. If there is any such restraint or limitation, it exists in the Constitution itself. Among the attributes conferred upon congress by that instrument is the power, “ to borrow money on the credit of the United States.” (Art. 1, § 8.) Then the Constitution declares that itself, and the laws made pursuant to it, and the public treaties, shall be the supreme law of the land, and paramount to the State Constitutions and laws. (Art. 6, If 2.) It may be safely admitted that any act of a State Legislature forbidding, or placing any substantial obstacles in the way of negotiating, Federal loans from the citizens of such State, would conflict with the Constitution. As the constitutional power to borrow money does not declare that it shall be procured within the Union, or from citizens of the United States, there is, perhaps, no corresponding duty on their part to lend. Nor was it intended that any such duty should be imposed. No enabling power in respect to the lender was required. Nothing was necessary but that the political corporation, which it was proposed to establish, should be endowed with the faculty of borrowing on the public credit. As to the rest, the money markets of the world were looked to for furnishing the other parties to the contract of lending. An unfriendly act of legislation which should exclude the Federal Grovernment from resorting to the money markets of a particular State for loans, though it might not seriously affect the exercise of the borrowing power elsewhere, would be so obviously hostile to the operations of the government, that I am confident it could not be sustained; and such is, no doubt, the effect of the judgment of the Supreme Court of the United *198 States in the -case to be presently mentioned. But our laws for the assessment, and collection of. taxes, supposing them to include shares in the public debt of the United States along with other personal property of the citizen, leave, the Federal Government in precisely the same condition with any other borrower: It was the practice of independent governments, as well as of municipalities and trading corporations, anterior to the Constitution, as it is. now, to¡ borrow money in their own or in foreign States. ' The citizens of the several States though not at that time lenders in such loans .to any considerable extent, were capable of becoming such. They might lend money to the Federal Government, .to the State governments, to foreign nations and, to ■ individuals. As to none of these, except the United States, is there any pretense that the State legislature was obliged to waive the right of -taxing the lender for his property in the obligation taken to secure the repayment of the.money loaned. In like manner, the Government of the United States possesses the same power to borrow in the marts of the old world as of its own citizens. But the foreign lender would of course be subject to the laws as to taxation, prevailing in the country of his domicil. The -claim, therefore, which is now interposed on behalf of the Federal Government, is of a right to present itself as a borrower in the money markets of this State, in a different and far more favorable position than our own State government occupies, when it has occasion for a loan, and, of course, than that which other borrowers, public, corporate or private, foreign or domestic, can pretend to. It is, moreover, the claim of a right to impose upon the legislature of the State, disabilities in respect to the taxation of moneys loaned to the United States, which there would be no..pretense for challenging against any foreign country, to which they might resort for the negotiation of loans. The claim is not supported by any specific language in the Constitution pointing to such consequences, nor as we have said by the terms of any statute, but simply upon the power to bor: row money upon the public credit conferred by the Constitution. Such a power, conferred by such general language, seems *199 to us fully satisfied, so far as the State governments are concerned, when no unfriendly discrimination towards the United States, as borrowers, is applied by the State laws; when the General Government is admitted to negotiate upon the same ■ terms as other borrowers, public or private, with such of our citizens as may choose to become lenders of money, and when they are placed, on the same precise footing in all respects, as all other borrowers. Prima facie, the provision simply confers upon the government a capacity to become parties, as borrowers upon the public credit, to a contract of loan. If it had been intended, beyond this, to give them, in the States of the Union, an advantage over all other borrowers, it is certainly remarkable that more explicit language was not used. We give no opinion on the question, whether Congress could enact a law by which the lenders of money to the government, should enjoy the advantage of exemption from State taxation in respect to such loans. Events may occur—perhaps they have already occurred—when the preservation of the Constitution" and the continuance of the Union, may depend upon the ability of the government to obtain a seasonable supply of ■ funds, and we would not unnecessarily interpose a dictvm which would appear to circumscribe any powers which it may possess. But in the absence of any such statute, and resting upon the general grant of power contained in the Constitution, we are of opinion that the claim to be exempt from taxation cannot be allowed to prevail.
The argument in favor of exempting the holders of Federal indebtedness from State taxation is principally based upon the consideration of the paramount authority of the Federal Constitution over the Constitutions and laws of the States. The preeminence of the former is beyond dispute. It is inherent in the nature of an imperial government, instituted to watch over and protect the interests and welfare of particular local governments. The powers conferred for such purposes.must necessarily be absolute and uncontrollable. All general reasoning upon the subject js, however, rendered unnecessary by the explicit provision referred to in the Constitution itself. *200 But before the State enactments can be called upon to yield to Federal institutions, it must satisfactorily appear that there is a conflict between them. Undoubtedly the Federal Government could enter the money market with greater advantage, if it could promise to the lenders an immunity against State taxation in respect to the money to be loaned. But, as no other borrower can offer any such advantage, and as, without it, loans have always been sought and obtained, and, no doubt, will continue to be, the withholding of it cannot be justly considered a restraint upon the borrowing power. What is asked is not in truth the removal of an obstacle, but a positive bounty to the lenders of money to the government. It is claimed that an advantage should be conceded to them which is rightfully withheld from every other lender. Hence, it appears to us that there is no hostility between the laws of this State which attempt to tax its citizens, among the mass of their property, for all their money loaned, without any exception of such as may have been lent to the Federal Government, and the power to borrow money which the Constitution has conferred upon that government. Both provisions can stand perfectly well together, and there is not really any conflict between them.
The power of taxation is as essential to the existence of the State governments as that of borrowing is to the nation. Both undeniably exist. The right of the several States to include the public creditors, in respect to the money owing to them by the nation, among the taxpayers, may be one of great importance. The amount of property existing in that form is now very large ; and public measures transpiring at this moment show that it is to be greatly increased. A judgment which should exonerate that mass of wealth from liability to contribute to the expenses of the State governments, might lead to considerable embarrassment. Besides, it would create a class of favored citizens, who could put the tax-gatherers at defiance, while the mass of the community would be left to defray the whole expense of the State and local administrations. This, it is true, should not prevent the rendering of such a judgment, if the true *201 interpretation of the Constitution requires it. But if it shall appear that the power of the Federal Government to contract loans cannot be materially impaired by holding the public creditor liable to pay his share of the public burdens, while the administration of the fiscal affairs of the States will be seriously embarrassed by withdrawing a large mass of the property of the citizens from liability to taxation, those circumstances (which are now actually transpiring) would seem to call for a reconciling construction which will allow both the great political powers to exist without either being essentially impaired. The necessity of such a construction of the Federal Constitution was foreseen while the draft of that instrument was under discussion, prior to its ratification by the State Conventions. One of the most indispensable powers conferred upon Congress was that of laying and collecting “taxes, duties, imposts, and excises.” But as the great bulk of the expenses of public administration was left to be defrayed by the States and their local divisions, the national government being limited to external relations and a few subjects of internal government, it was essential that the right of taxation should continue to be enjoyed by the States, to enable them to meet these necessary expenses. They were, however, prohibited from laying duties upon imports or exports, or upon tonnage, without the consent of Congress; but as to all other subjects of taxation, embracing the real and personal estates of the citizens,, the Constitution was silent as to the rights of the States. A rigid construction of the provision making the Federal laws, enacted pursuant to the Constitution, supreme over those of the States, would forbid the latter from exercising a concurrent right of taxation over subjects as to which the taxing power of Congress should be applied. Suppose, for instance, that the General Government should lay a land tax, could a State Government do the same thing while the Federal law remained in force? True, if the State tax was of moderate amount, the land-owner would be able to pay both, and thus no embarrassment would arise to the General Government. But it might be said, if you admit the principle of concurrent taxation by *202 the States, it will not be possible so to limit the amount as to prevent inconvenience in the exercise of the Federal power; and the Federal laws are declared to be paramount to those of the States. Hence, it was apprehended that the taxing power of the States might be held to be taken away by the like power which the Constitution conferred upon Congress. This objection was treated of in the 32d and 33d Letters of Publius, written by Mr. Hamilton. He maintained, by a convincing train of reasoning, that the taxing power of Congress was not, in respect to any subjects except imposts, exports and tonnage, exclusive of or superior to that of the States, but that they were concurrent. “ The necessity,” he said, “of a concurrent jurisdiction in certain cases, results from the division of the sovereign power; and the rule that all authorities, of which the States are not explicitly divested in favor of the Union, remain with them in full vigor, is not only a theoretical consequence of that division, but is clearly admitted by the whole tenor of the instrument which contains the articles of the proposed Constitution.” (Federalist, No.'32.) He insisted that it was not a case of repugnancy in that sense which would be requisite to work an exclusion of the States. While he admitted that it was possible that a State might tax a particular kind of property in a manner which would render it inexpedient .that a further tax should be laid on the same subject by the Union, he still held that.it would not imply a constitutional inability to lay such further tax. He conceded that the particular policy of the national and the State systems might now and then fail to coincide exactly, and that forbearance might be required. “It is not, however,” he added, “a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy, that can, by implication,- alienate and extinguish a preexisting right of sovereignty.” (Id.) And he concludes, as the result of the whole argument, that the individual States would, under the proposed Constitution, retain an independent and uncontrollable authority to raise revenue to any extent they might stand *203 in need of, by every kind of taxation except duties on imports, exports and tonnage. (Federalist, Eo.-33.)
The repugnancy between the concurrent powers of taxation residing in the General and in the State governments seems equally as striking as that which is alleged to exist between the Federal power of borrowing money and the State power of taxing all the property of the citizen, including his money invested in loans to the government. It may be said that the latter power can be exerted to an extent which would impair the efficiency of the other. But such an effect, if produced, would be incidental and indirect. State taxation might, it is true, supposing a very extreme case, be carried to such an extent that nothing would be left to lend to the nation. But if no unfavorable discrimination is made as to money invested in federal loans, it cannot be alleged that such excessive taxation would be any more hostile to the borrowing power of the General Government than any other species of State misgovernment; and it can scarcely be pretended that the Federal institutions are supreme in such an absolute sense that any State power which, by a possible abuse, may impair the efficiency of some national attribute, is necessarily abrogated. Indeed, the complaint on the part of those who oppose the claim of the State is, as has been already remarked, not so much that our State tax law conflicts with the Federal power to borrow money, as that it does not concede to the Union superior rights in our money market over those enjoyed by any other class of borrowers.
It remains to notice the judgments of the Supreme Court of the United States which, it is argued, have laid down principles which lead to the entire exemption of Federal stock from State taxation. In McCullough v. The State of Maryland (4 Wheat., 116), the question, in substance, was, whether the issues of bank notes by the Maryland branch of the Bank of the United States could be subjected to a stamp tax under the laws of Maryland. That State had passed an act requiring banks transacting their business in that State, but which were not chartered by the State legislature, to issue their notes on *204 stamped paper on which a certain duty was to be paid, but for which any bank might commute by paying a tax of fifteen thousand dollars a year in advance. A heavy penalty was provided against any bank officer who should issue unstamped notes; and. the action was brought against McCullough, the cashier of the Baltimore branch of the Bank of the United States, to recover penalties for a violation of the act. . The constitutional validity of the act of Congress incorporating the bank was largely discussed, and was passed upon by the court; and its constitutionality was sustained. The bank was considered a convenient, useful and essential instrument of the government in the prosecution of its fiscal operations, and its establishment by Congress was held to be the constitutional exercise of the power “ to make all laws which [should] be necessary or proper to carry into execution” the authority granted to the General Government. Then the question as to the power of the States to tax the bank or its branches was considered and determined. But when it had been once settled that the bank was a constitutional agency and instrument for the transaction of the moneyed operations of the government, it followed necessarily, as it seems to us, that it could no more be taxed by State authority than the treasury department, the mint, the post-office, or the army or navy; and it was upon this ground that the Maryland statute was held to be unconstitutional. The State power of taxation, which was admitted to embrace everything which existed by its own authority, or which was introduced by its permission, was held not to “ extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States.” (See opinion of Chief Justice Marshall, p. 429.) The same question again arose in Osborn v. The United States Bank (9 Wheat., 738), which was an action brought to test the validity of a statute of the State of Ohio, by which an annual tax of $50,000 was imposed upon the Ohio branch of the Bank of the United States, to be collected by means of a warrant to be issued by the auditor of the State. The question was again elaborately argued and considered by *205 the court, and the exemption of the bank and its branches again declared, on the ground that the institution was an instrument, or, as it was several times called in the opinion of the court, a machine, for carrying on the moneyed operations of the national government. In the State laws under consideration in both these cases, the branches of the bank were taxed, not in respect to their property, but, eo nomine, as banks, and because they were banks. Perhaps it may be inferred from the reasoning of the court that they would have been held equally exempt from taxation, if the tax had been laid on the corporation in respect to its capital or personal property. No idea, however, was entertained that the money which was invested in the stock of the bank was thereby withdrawn from State taxation. Indeed, such a conclusion was explicitly disavowed in the opinion of the Chief Justice, in the first mentioned case. “ This opinion,” he says, “ does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid on the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State. But this is a tax on the operations of the bank, and is, consequently, a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution. Such a tax must be unconstitutional.” (4 Wheat., 436.)
Enough has been said to show that these cases bear no analogy to the one before us. But, in Weston v. The City Council of Charleston (2 Pet., 449, anno 1829), the subject Oj. State taxation of the debt of the United States, in the hands of an individual, came directly before the Federal Supreme Court, and the judgment was against the right to lay the tax. The case differs from the present only in the circumstance that the tax was not laid upon the bulk of the property of the citizens, but only upon certain specified securities, and that it was imposed upon the United States stock eo nomine. It was imposed by the municipality of the city of Charleston, *206 South Carolina, under authority derived from the legislature of that State. It was laid, as the report states, “ upon all personal estate consisting of bonds, notes, insurance stock, six and seven per cent stock of the United States, or other obligations upon which interest has been or will be received during the year, over and above the interest which has been paid (funded debt of this State, and stock in the incorporated banks of this State and the United States Bank, excepted"); and the amount of the tax was “twenty-five cents upon every hundred dollars.” Beal estate does not appear to have been embraced. Neither were goods or personal chattels of any kind, or slaves, or the stock of the General Government paying less than six per cent, or simple contract debts due to the taxpayer, or indi vidual obligations on which, for any reason, interest should not'be paid within the year; and the public debt of the State, the stock of all the State banks, and that of the Bank of the United States, were in terms excepted. It was not, therefore,, a tax upon the property of the taxpayer generally; but particular kinds of property were selected from the mass, embracing, in all probability, far less than a moiety of the private property of the city, and the tax was assessed upon that, to the exoneration of all the residue. And the tax imposed was not limited to the aggregate of the public charges for the year; but an arbitrary sum was exacted of twenty-five cents on each hundred dollars, whether that should be more or less than the exigencies of the city government should call for. The different system upon which the taxes of this State are assessed, has been already shown. Under the ordinance of the city of Charleston, the United States would not enter the money market of that city upon an equal footing with all other borrowers. The State of South Carolina, for instance, could assure those who should lend it money that they should be exempt from city taxation, and the same advantage would be extended to capitalists who were minded to invest in the stock of the State banks or in that of the Bank of the United States. So, money or property invested in mercantile, manufacturing or other business, so long as it did not assume the form of interest-pay *207 ing obligation's, would be exempt from taxation. The law, or ordinance, discriminated, in respect to taxation, adversely to certain classes of securities, including the scrip of the public debt of the United States". The effect upon the government was nearly the same as though the funded debt of the Union had been singled out as the sole subject of taxation. Including other securities, the whole constituting only a part of the property of the citizens which might be subjected to taxation, does not relieve the law from the charge of visiting the whole of the public burdens upon particular kinds of property in exoneration of the mass of it. Such a measure might arise either out of motives of hostility to the property charged or the business out of which it originated, or from a motive of hostility to the interests taxed, or a desire to favor the owners of the residue at the expense of such interests. In either case it might easily be carried to the extent of seriously discouraging or entirely destroying the interests discriminated against. But where all the private property of the community is taxed ratably, no such effect could follow, and under such a system, moreover, there is but little danger of oppressive taxation. In levying such a tax, the legislature acts equally upon all its constituents. In our opinion, the judgment last referred to is distinguishable in principle from the case we are considering, in the point to which we have now referred. If the Federal stock can be taxed separately and specifically at any amount which a State legislature, or a municipality to which its power has been delegated, shall see fit, the government in seeking to obtain money on loan may be effectually driven out of the markets of such State. But such a consequence could never happen under the existing tax law of this State. The idea that the legislature would dare, or would be permitted, by excessive taxation, to destroy or seriously embarrass the interests of all the property holders of the State, is not to be supposed.
Intending as we do to follow implicitly the matured judgments of the Supreme Court of the United States, pronounced in cases arising under the Federal Constitution and Laws, we yet conceive ourselves at liberty to receive or to reject any dicta *208 which were not called for by the facts of the case adjudged, according to our own sense of their conformity or Want of conformity to law. We are aware that some portion of the reasoning of the opinion of the court, prepared by the venerable Chief Justice in the case referred to, would embrace the present controversy, though other parts of it we think refer to the tax under consideration as laid specifically upon Federal stock; and that in the dissenting opinion of Mr. Justice Thompson, the majority of the court are understood to assume the broad ground that the stock of the United States is not taxable in any shape or manner whatever. But we think it was not legally possible for the court to decide, that such stock could not be taxed along with the mass of the taxpayer’s property, under a taxing system like the one prevailing in this State, while determining a controversy in which the actual facts presented by the litigation disclosed a case of taxation discriminating adversely to such stock. Such a question as is claimed to have been decided, was not discussed by the -counsel on the argument. The counsel for the plaintiff in error, who was the party seeking to avoid the tax, did not contend that the stock would be exempt under a system which should embrace all property or even all public funds. He said: “ The ordinance does not impose a tax upon all public funds, but specifically on the six and seven per cent stock of the United States-. Thus, there are selected as the particular objects of taxation, these debts of the Government of the United States.” And the counsel laid before the court as a part of their argument the opinion of three of the judges of the Constitutional Court 'of South Carolina, who, holding that the stock was not taxable, dissented from the opinion of the majority: But they placed their dissent on the ground that the tax was upon the stock, eo nomine, and was thus a burden imposed upon the credit of the United States.
We differ with natural reluctance from even an obiter dictum of so great and wise a judge as Chief Justice Mabshahl, especially when apparently concurred in by a majority of the judges of the national tribunal of last resort; but we are happy to know that if we have fallen into an error, it can readily be *209 corrected. If that eminent court shall, upon a reconsideration of the question, adjudge that stocks of this description are universally exempt from taxation, we shall cheerfully conform our judgments to such decision; but until such review shall be had, we think it safer to follow the direction of our own convictions. The question is confessedly one of very, great importance. If we determine it in favor of the taxpayer, the public authorities cannot appeal to the Federal court, as it is only in the case of a right, claimed under the Constitution or laws of the United States, which has been denied by a State court, that the national tribunal has jurisdiction, whereas the judgment, which we actually render, can be carried immediately to the court of the last resort.
The judgment of the Supreme Court is affirmed.